FILED

2006 Aug-17  PM 03:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN  DIVISION

| | |
|---|---|
| **WAYMON BLEVINS,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **5:05-CV-1397-VEH** |
| **BILL BAXTER, Director, in his** ] | |
| **official capacity, SKILA HARRIS,** ] | |
| **Director, in her official capacity,** ] | |
| **TENNESSEE VALLEY** ] | |
| **AUTHORITY,** ] | |
| ] | |
| **Defendants.** ] | |

## MEMORANDUM OPINION

Pending before the Court is the Defendants' Motion for Summary Judgment (doc. 17) filed on May 12, 2006.  Plaintiff Waymon Blevins filed a Complaint on June 27, 2005, alleging claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 set seq (2000), the Americans with Disabilities Act, 42 U.S.C. § 12112 (2000), and the Rehabilitation Act, 29 U.S.C. § 794 (2000), against Skila Harris and Bill Baxter, two members of the Tennessee Valley Authority (TVA) Board of Directors (Defendants)(1st Am. Compl. ¶ 1).[1]  Plaintiff alleges that he was

---

[1]    When Plaintiff filed this action on June 27, 2005, he initially named Glenn L. McCullough, Jr., the former Chairman of the TVA Board of Directors (TVA Board), as the sole Defendant.  However, because Chairman McCullough's term as a TVA Director expired in May 2005, Plaintiff amended his complaint on July 7, 2005, to name Director Harris and then

discriminated against on the basis of age[2] and disability and retaliated against for his EEO activity when he was removed from TVA's Multi-Skill Training (MST) program in January 2003 (1st Am. Compl. ¶¶ 26, 39, 58-59, 67-69).  Plaintiff also alleges that his non-selection for "various positions was retaliatory in that it was motivated by Plaintiff's charge of discrimination and his participation in an investigation and proceeding arising under 42 U.S.C. § 12112, 29 U.S.C. § 794, and 29 U.S.C. § 621, et seq." (1st Am. Compl. ¶ 74).

Defendants contend that they are entitled to summary judgment in their favor as to all claims asserted against them in Blevins's Complaint.

The matters have been briefed extensively by all parties, and are now ripe for determination.

---

Chairman Baxter as the only Defendants.  As a result of an amendment (Pub. L. No. 108-447, div. C, tit. VI, 118 Stat. 2809, 2963-67) to the Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831-831ee (2000 & Supp. III 2003), the structure of TVA's Board of Directors was changed from a three-full-time-member-board to a nine-part-time-member-board.  Thus, on March 31, 2006, six individuals were sworn in as additional members of the TVA Board:  Bill Sansom, Dennis Bottorf, Don DePriest, Mike Duncan, Howard Thrailkill, and Susan Richardson Williams.  Also on March 31, Defendant Bill Baxter stepped down as Chairman and Mr. Sansom was elected Chairman of the TVA Board.

[2] In his Brief in Opposition to the Motion for Summary Judgment, Blevins "concedes" his claim of age discrimination.  Motion for Summary Judgment (doc. 24), p. 23.  The Court therefore will not further address Blevin's age discrimination claim

## Relevant Facts[3]

### I.    TVA's Exclusion of Plaintiff from the MST Program.

### Background

Blevins began working for TVA as an hourly worker on September 12, 1977, at the Bellefonte Nuclear Plant.  TVA, a corporate agency and instrumentality of the United States of America, created by and existing pursuant to the TVA Act, is a regional resource agency and is the Nation's largest public power provider.  With nearly 34,000 megawatts of generating capacity, TVA supplies electric power to over eight million customers.  In accordance with authority granted by the TVA Act, TVA owns and operates Widows Creek Steam Plant (Widows Creek) in Jackson County, Alabama, which produces electricity using eight coal-fired turbo-generating units with a combined net capacity of 1,750 megawatts.  It generates about 10 billion kilowatt-hours of electricity a year, enough to supply 650,000 homes, and consumes about 10,000 tons of coal per day.  Brabham decl. ¶ 2.

### Plaintiff's Employment and Medical Restrictions

Plaintiff has been employed by TVA at Widows Creek as an annual boiler maker since 1992.  Since the spring of 1996, Blevins has had the following medical

---

[3]Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff.  Facts are undisputed unless otherwise expressly noted.

restrictions as prescribed by his doctor: "limited ability to stoop, crouch or bend" and "limited ability to lift more than 20 pounds." (Brabham decl. ¶ 4, Exs. C, D; 1st Am. Compl. ¶ 18, 19, 20; Blevins dep. 110, 125). TVA policy prohibits an employee from being assigned work that would interfere with the employee's medical restrictions. (Brabham decl. ¶ 3, Ex. A).  Despite his restrictions, Blevins is able to do a certain amount of stooping, crouching, and bending. In a deposition, Blevins testified to the following, "[I] can pretty well do whatever I need to do in my job or my type of job." (Blevins dep. 117-18). Although he does not "play golf," "twist and turn in my back very well," or "go in the mountains and hike and hunt like [he] used to like to" (id. 118-19), Blevins has never requested an accommodation from TVA based on his medical restrictions. (Id. 133; 1st Am. Compl. ¶ 22).

**TVA's transition to the use of Multi-Skilled Technicians**

Trades and labor work at TVA have traditionally been performed by employees represented by a number of craft unions. The craft unions have historically maintained separate, distinct, and traditional jurisdictional lines between the work done by each of the unions. Over the years, TVA concluded that the efficiency of TVA's maintenance work at its operating plants was seriously impeded by the requirement that it assign maintenance and operating work based on strict craft jurisdictional boundaries. Accordingly, in 1974 TVA entered into two separate

4

collective bargaining agreements, one for construction employment, which continued the traditional craft boundaries, and one for operating and maintenance employment, which contained a new mixed or composite crew provision. The pertinent part of said provision states that "work assignments are made on the basis of skills required for the work to be done.  Journeymen of one craft, in addition to the work ordinarily performed by their craft, may be assigned to work that is normally done by other crafts."  (Brabham decl. ¶ 6, Ex. E at ¶ 4).

TVA used this mixed or composite crew concept for a number of years.  In 2000, TVA and the Tennessee Valley Trades and Labor Council, which represents the various craft unions, agreed to transition from traditional craft classifications to new multiple skill job classifications for certain TVA craft employees, including those at Widows Creek.   The agreement was based on the recognition that "performance of cross-craft multiple skill tasks [would] help TVA and its employees remain competitive; and that by broadening employees' skills, many of the handoffs that cause delays and interruptions in work processes will be reduced."  (Brabham decl. ¶ 7, Ex. F at 1).  Persons employed as of date of the agreement ("current" employees), were going to be offered the opportunity to receive additional multi-skill training through the Multi-Skill Training (MST) program (Id. at 2).  "Current" employees who do not participate in the MST program are classified to Level II

Multi-Skill Technicians at a wage rate of 100% of the former journeyman level wage (Id. at ¶ 14). Employees who successfully complete MST are classified to the level of qualification attained, Level III or Level IV Multi-Skill Technicians, with a premium of 5% or 10% percent, respectively (Id. at ¶ 11). Unlike "current" employees, the agreement requires individuals hired after November 3, 2000, to progress to Level III as a condition of continued employment (Id. at ¶¶ 10, 12).

### TVA's process for evaluating employees with medical constraints

There were some employees with medical constraints who attended MST. (Exhibit 17, McCarver depo., 17:22-23:15). However, shortly after the commencement of the MST program, TVA announced that "TVA will **not** pay a premium for employees who cannot perform the essential functions and meet the physical requirements of the new multi-skilled classifications." (Brabham decl. ¶ 7, Ex. G at 1; emphasis in original). The policy required that prior to entering the MST program, employees with medical restrictions/constraints be evaluated to determine whether they could safely and efficiently perform the essential functions of the new multi-skilled positions. Like those who choose not to participate in MST, current employees who are not permitted to proceed with MST because of medical restrictions/constraints, are classified as Level II. (Id. at 2).

To enable TVA to provide consistent decisions regarding employees on

6

medical constraints and to ensure that management considers all relevant aspects of a situation, TVA established a Workplace Evaluation Team (WET) (Brabham decl. ¶ 8, Ex. H). "The WET ensures that management has looked at all aspects of the situation, including the employee's medical constraints, whether such constraints are temporary or indefinite...Based on all the factors, the WET makes recommendations to managers who supervise employees with medical restrictions/constraints." (Id.)

### TVA's decision not to allow Plaintiff to proceed with MST

In light of TVA's policy to evaluate employees with medical constraints before entering the MST program, TVA had Blevins examined in October 2002, to review whether his medical constraints should be continued. The examination concluded that his constraints should not be changed without an examination by Plaintiff's own doctor and a functional capacity evaluation (FCE). ( Brabham decl. ¶ 9, Ex. I).

In January 2003, when Plaintiff sought to participate in MST, he was informed by TVA management that because he had indefinite medical restrictions, he could not enter MST without further evaluation. (Ferguson Aug. 18, 2003, aff. at 4-5; Brabham decl. ¶ 10). The WET reviewed Plaintiff's constraints and concurred in management's decision that Blevins could not safely perform the essential functions of the job. (Id., Ex. H, ¶10). Blevins states that he performs jobs that require multi-skill training every day. Furthermore, Blevins receives and performs the same work

7

orders that are given to other employees who have gone through MST.  (Def. Tab No. 22, Blevins depo.,  148:4-148:11).

According to Darrell Ferguson, there are no physical differences between a Level II technician (Plaintiff's current designation) and a Level III technician (position Plaintiff would achieve had he been allowed to remain in MST).  The difference, rather, is that a Level III technician has had several weeks of off-site training that covers certain electrical, machinist, pipe fitter, and boiler maker work [attended 6 week MST course].  (Exhibit 4, Ferguson depo., 20:7-20:16).

TVA scheduled Plaintiff for an FCE in October 2003, to determine if his constraints should be continued (McCarver Oct. 1, 2003, aff. at 6).  However, Blevins provided TVA with a letter from his orthopedist that recommended against the FCE and insisted on continuing his medical constraints.  (Brabham decl. ¶ 11, Ex. K).

Finally, in December 2003, TVA conducted a job/task analysis to determine the essential functions of the Mechanical Maintenance Technician positions and the associated physical activities and physical requirements.  Defendants assert that the analysis showed that Blevins could not perform all of the essential functions of the position, with or without available workplace adjustments and therefore the decision that he could not enter MST remained unchanged.  (Brabham decl. ¶12, Exs. L, M).  Blevins disputes the foregoing, citing evidence that the only difference between Level

II and Level III technician is some off site training. ( Ferguson depo., 20:7-20:16).

## II.    Plaintiff's Non-Selection for Three Vacant Positions

### TVA's selection process

Congress vested the TVA Board of Directors with broad discretion to determine what process to use in selecting employees.  Thus, at the time of the events complained of, Section 3 of the TVA Act authorized the TVA Board to "provide a system of organization" and to select employees "without regard to the provisions of Civil Service laws applicable to officers and employees of the United States" (16 U.S.C. § 831b (2000)).  Section 6 of the TVA Act also gives the TVA Board broad discretion as to the criteria for selections, requiring only that they be "made on the basis of merit and efficiency" (16 U.S.C. § 831e (2000)).

In general, TVA's policy entitled "Filling Vacant Positions" provides that the steps of the "process for filling positions with current TVA employees" "normally include":

> Identifying the vacancy
> Developing the job description
> Classifying the position
> Preparing and posting the vacancy announcement
> Developing a list of qualified candidates by reviewing personal history records (PHRs), resumes, applications, and other background information
> Selecting candidates for interviews to participate in the selection process (i.e., structured interview, etc.)

9

Conducting the selection process
Making the selection and extending the offer
Notifying candidates not selected

(Brabham decl. ¶ 14, Ex. N at 1).  The policy further provides that "[p]ositions are advertised as provided in TVA's negotiated agreements and in other agreements or commitments." (Id. at 2).  The policy also states that "[m]erit and efficiency form the basis for selection of job candidates" and provides the following general guidance:

> Factors such as candidates' education, training, experience, ability, and previous work performance serve as a basis for appraisal of merit and efficiency.  When employees are selected for positions covered by agreements negotiated by employee unions and organizations, the provisions of those agreements are followed.  In applying the standards of merit and efficiency to hiring decisions, TVA's organizational needs, objectives and efficiency are also considered.

(Id.)

When Blevins interviewed for the first time for the Maintenance Foreman position, Plaintiff was serving as a temporary foreman.  Plaintiff held the position of temporary foreman for approximately 26 months.  (Exhibit 10, Sworn Statement of Plaintiff, 6/7/01, 4:15-4:25 ).

In each of the three selections, TVA advertised the vacant position, reviewed the personnel records of the applicants to determine who should be interviewed, and a three member panel scored the interviews using structured interview questions. (Brabham decl. ¶ 15-17, 19-20, 22-24).

10

Each candidate's responses to the questions were scored by the team members and a total score was determined by adding all of the scores.  (Brabham decl. ¶¶ 17, 20, 24, Exs. P, R, S).

No one on any of the interview panels expressed any misgivings about Plaintiff's age and no one made any age discriminatory or derogatory remarks about the EEO process.  (Blevins dep. 48, 63-4, 68-70, 107).  There is no evidence to indicate that the interview scores were based on anything other than the answers to the interview questions.  (Blevins dep. at 48; Guess July, 17, 2001, aff. at 4, 9; Gray July 17, 2001, aff. at 4, 10; Gott July 17, 2001, aff. at 4, 7; Peacock aff. at 4, 9; Gray Feb. 24, 2003, aff. at 5, 6; Guess Feb. 24, 2003, aff. at 4; Guess Mar. 12, 2003 aff.; Gray Mar. 12, 2003 aff.; Ferguson Dec. 8, 2003, aff. at 3-4, 8; Bynum aff. at 4-5, 9-10; Gott Nov. 24, 2003, aff. 8-9, 13-14).

Plaintiff's Employee Service Reports demonstrate that at all times he was meeting the reasonable expectations of TVA. (Exhibit 3, Employee Service Reports).  At the time when Lonnie Gray and James Guess supervised Plaintiff, neither one ever wrote up, suspended or reprimanded Plaintiff, and Plaintiff always did his job in a manner designed to meet the requirements of TVA. (Exhibit 12, Gray depo., 21:5-21:13; Exhibit 14, Guess depo., 10:13-10:21).  When Plaintiff was temporary foreman, McCarver wrote him and his crew congratulating them for their good work.

11

(Exhibit 17, McCarver depo., 36:4-36:21).  During the time Gott supervised Plaintiff (3 years plus), Gott never issued any write-ups, reprimands, warnings, etc. to Plaintiff. (Exhibit 9, Gott depo., 11:25-12:3; 12:23-13:3).  Gott also stated Plaintiff is a good employee.  (Exhibit 9, Gott depo., 13:14-13:16).

The selection committee for the first Maintenance Foreman position was comprised of Lonnie Gray, James Guess, and Ricky Gott.  Plaintiff's total interview score of 95 placed him 8th of the 10 candidates and 4 candidates who were older than 40 scored higher than Plaintiff.  The interview panel recommended Kenneth Palmer, who scored 159, the highest score among all of the candidates, for the job. ( Brabham decl. ¶ 17, Ex. P).  Plaintiff admitted that Mr. Palmer's answers to the interview questions were "nearly perfect."  (Brabham decl. ¶ 18, Ex. Q at 2.)[4]

Blevins testified that, subsequent to filing his grievance, Ricky Steele told him that "the way you handle a complaint could determine if you would be given a foreman position."  (Def. Tab. No. 22, Blevins depo. 144:15-145:18).

During the second selection process for a Maintenance Foreman, there were twenty-eight applicants; of the twenty-eight, eighteen, including Plaintiff, were selected to be interviewed for one or more positions.  In addition to being scored by

---

**2**    Plaintiff's speculation that Mr. Palmer was given a copy of the answers can not create a disputed issue of fact in the face of the undisputed evidence in the record that he was not given such assistance.  Brabham decl. ¶ 18, & Ex. Q at 2.

the three-member interview team using structured questions, the candidates were evaluated and scored on the category of "Qualifications and Performance" by comparing the requirements of the job with the candidates' prior service reviews and the evaluator's knowledge of their work at the plant.  The total interview score and the "Qualifications and Performance" score were each given a weight of 50 percent and the five candidates with the highest scores were offered the positions.  Since Plaintiff had the twelfth highest score, he was not selected.  (Brabham decl. ¶¶ 19, 20, Ex. R).

Lonnie Gray and James Guess, two members of the interview panel for the selection of the Maintenance Foreman which resulted in Blevin's second non-selection were the subjects of Plaintiff's first EEOC complaint, filed on April 18, 2001.  Gray and Guess were also two of the three members of the interview panel for the selection of the Maintenance Foreman which resulted in Blevin's first non-selection.  (Ex. 10, Plaintiff's Sworn Statement, June 7, 2001, 3:24-4:3).

On the third selection, twenty-two individuals applied for a Maintenance Coordinator position.  Unlike the above two foreman positions, such a position is a management-level position generally responsible for developing and improving the work management system at the plant and for developing and coordinating work planning packages.  (Brabham decl. ¶ 22).  A two-step selection process was used.

13

First, all of the candidates were evaluated and scored on "Qualifications and Performance" by reviewing applications and personnel records against pre-determined standards in the following areas:  (1) level of education; (2) experience in planning and scheduling, (3) frequency of use of TVA's computerized work management system, (4) specified plant supervisory experience, and (5) plant maintenance experience.  The top twelve candidates, including Plaintiff, were invited for interviews, with one declining.  (Brabham decl. ¶ 23, Ex. S).

Those eleven candidates were also interviewed using structured interview questions by a three-member panel.  The final score was the total of the interview and "Qualifications and Performance" scores.  The top-ranked candidate, Melinda Saint, was offered and accepted the position, while Plaintiff was ranked seventh of the eleven candidates interviewed.  (Brabham decl. ¶ 24, Ex. S).

On April 18, 2001, Plaintiff filed his first EEO complaint based on age discrimination for nonselection for Maintenance Foreman on February 1, 2001. Kenny Palmer, who was 38 years old at the time of the selection, was selected.  James Steele was the selecting official.  (Exhibit 22, Preliminary Inquiry: Request for Information).  Bynum was Plaintiff's EEO Counselor on his first EEO complaint, and Plaintiff discussed it with her.  (Exhibit 16, Bynum depo., 9:20-10:9).

On November 14, 2002, Plaintiff filed his second EEO complaint based on

reprisal for non-selection for Maintenance Foreman on August 15, 2002.  Quinton Hookey was one of the five selected.  At the time he was selected, Hookey was with TVA for less than 18 months and only 6 months as a dual rate foreman when he was selected.  (Def. Tab No. 36, Plaintiff's Sworn Statement, dated 2/5/03, 11:10-11:20; Exhibit 17, McCarver depo., 32:25-33:3).

On April 18, 2003, Plaintiff filed his third EEO complaint based on age discrimination, disability discrimination and reprisal when he was removed from MST on or about January 13, 2003.  (Exhibit 2, EEO Counselor's Report).

On August 18, 2003, Plaintiff filed his fourth EEO complaint that he was discriminated against because of reprisal when he was not selected for Maintenance Coordinator on or about March 5, 2003.  (Exhibit 19, EEO Counselor's Report).

The selection committee that conducted the interviewing for the Maintenance Coordinator position was comprised of Ricky Gott, Gladious Bynum, and Darrell Ferguson.   All three panel members gave the same exact ratings for Blevins on all ten questions.  Some panel members even crossed out certain scores and circled or checked a different score that matched the other panel members ratings.  Gott not only knew of Plaintiff's prior EEO filings, he was the subject of the first EEO complaint and gave a sworn statement on July 17, 2001.  (Def. Tab No. 27, Gott Affidavit, 7/17/01).  Less than a year and a half later, Gott was the selecting official

for the Maintenance Coordinator position.  Plaintiff interviewed for the Maintenance Coordinator position on January 29, 2003.  (Exhibit 19, EEO Counselor's Report, p. 2).  Eric Watkins, an employee at Widows Creek, asked Gladious Bynum around the time that Saint was selected for Maintenance Coordinator, why he had not received an interview.  Bynum told him that, " [i]f you ain't black or female, I can't help you." Bynum then proceeded to enter the Scrubber shop and stated to the crew sarcastically, "[i]f you keep filing complaints, we can probably get you one of those jobs."  (Exhibit 15, Watkins decl., ¶¶ 1, 3, and 4).  Watkins also spoke with Ricky Gott, the final decision maker on the Maintenance Coordinator position and a decision maker in determining who would be interviewed, about why he was not selected for an interview.  Gott told him, "[i]f you make waves and file complaints, you don't get jobs."  (Exhibit 15, Watkins decl., ¶ 5).

At the time he filed an EO complaint, Blevins did not provide the EEO investigator with any information as to who in management allegedly made retaliatory or derogatory statements or the identity of any witnesses to such statements.  Blevins testified that, at the time, he did not have the information from Eric Watkins regarding Gladious Bynum and Ricky Gott.

## Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden

18

of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## Analysis[5]

### I.   Disability Discrimination

---

[5]Because Plaintiff has conceded that his claim of age discrimination fails, the Court does not analyze that claim.  *See* footnote 2, supra.

19

Blevins contends that the "direct evidence of discrimination in this case is provided by the employer's facially discriminatory policy of refusing MST training to persons with medical impairments". (Pla. Response, p. 28). However, the undisputed facts illustrate otherwise. According to the record, only where an evaluation of the medical restrictions results in a conclusion that the employee is unable to perform the essential functions of the job does TVA refuse to permit the employee to proceed with MST. (Def. Tab 1, 8-14; Brabham Declaration ¶¶ 7-12).[6] TVA's policy provides that prior to entering the MST program, any employees with medical constraints must be evaluated to determine whether they could safely and efficiently perform the essential functions of the new multi-skilled positions. In light of TVA's policy to evaluate employees with medical constraints before entering the MST program, TVA had Blevins examined in October 2002, to review whether his medical constraints should be continued. The examination concluded that his constraints should not be changed without an examination by Blevins' own doctor and a current functional capacity evaluation (FCE). ( Brabham decl. ¶ 9, Ex. I). In January 2003, when Plaintiff sought to participate in MST, he was informed by TVA management that, because of his medical restrictions, he could not enter MST without

---

[6]Lois Shelton, another employee with medical constraints, was permitted to proceed with MST because the WET evaluation concluded that, despite her limitations, she was able to perform the essential functions of the job. (Brabham Supp. Decl. par. 7).

further evaluation.  (Ferguson Aug. 18, 2003, aff. at 4-5; Brabham decl. ¶ 10). TVA

scheduled Plaintiff for an FCE in October 2003, to determine the current extent of his

medical constraints.  (McCarver Oct. 1, 2003, aff. at 6).[7]  The Court finds that, on its

face, this policy is not discriminatory.  There are guidelines in place to enable

employees who have medical constraints to participate in the training program despite

the existence of such constraints.[8]

Blevins contends  that notwithstanding his medical constraints, he has been

given the same assignments as other employees and that he has always been able to

perform his job assignments. TVA responded with testimony explaining that because

he was only given assignments that were within the parameters of his medical

constraints, "it goes without saying" that Blevins was able to perform the tasks he was

assigned.[9]

The Court finds that Blevins has failed to provide direct evidence of disability

---

[7] However, Blevins provided TVA with a letter from his orthopedist that recommended against the FCE and insisted on continuing his medical constraints.  (Brabham decl. ¶ 11, Ex. K).

[8] The policy does not prohibit all employees who have medical constraints from participating in MST.

[9] Although Blevins contends that he was never "given any special work assignments" and that he "perform[s] the same job and functions as the others in the same position", the Court acknowledges that there is testimony that supports otherwise.  In fact, Blevins is given some of the same assignments as other boiler makers, but only those assignments that are consistent with his medical constraints.  As a result of such constraints, Blevins cannot be given assignments within the full range of duties of his position and that of a Level III. (McCarver Depo. 38-39; 47-48; 52; McCarver Decl. par. 3, Ex. 1).

discrimination against him by TVA.

## A.    Impaired

_____In their motion, Defendants contend that Blevins is not disabled under the Rehabilitation Act and that the decision not to allow him to participate in the MST program was not based on the alleged notion that he was disabled.  Defendants steadfastly assert that no one at TVA regarded Blevins as disabled.   Instead, the decision not to allow Blevins to participate in MST was based on a determination that, due to his specific medical constraints, he was unable to perform the essential functions of the Multi-Skill Level III Technician position.[10]

The Rehabilitation Act ("the Act") prohibits federal agencies from discriminating in employment against "otherwise qualified" individuals with disabilities.  29 U.S.C §791.[11]  "The standard for determining liability under the Rehabilitation Act is the same as that under the ADA." *Sutton v. Lader*, 185 F.3d 1203, 1207 n.5 (11th Cir. 1999).  In the absence of direct evidence, an ADA violation based on circumstantial evidence is analyzed using the traditional *McDonnell-Douglas* burden-shifting scheme commonly used in Title VII employment

---

[10]Defendants ardently reject the notion that their acknowledgment of Blevins's medical constraints necessarily compels the conclusion that they considered him disabled.

[11] There is no dispute that the defendant is a federal entity.

discrimination cases.  *Wascura v. City of South Miami*, 257 F. 3d 1238, 1242 (11th Cir. 2001).  Under the *McDonnell-Douglas* framework, the plaintiff must first establish a prima facie discrimination case. *McDonnell-Douglas v. Green*, 411 U.S. 792, 802-04 (1973).  If the plaintiff meets this burden, the defendant must articulate a legitimate, nondiscriminatory reason for the allegedly discriminatory activity.  *Id.* If the defendant meets its burden of production, the plaintiff must present concrete evidence, sufficient for a reasonable jury to conclude that the articulated reason is pretextual, in the form of specific facts that either show that a disability played an impermissible role in the employer's decision or that the proffered nondiscriminatory reasons are unworthy of credence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

To establish a prima facie case of discrimination under the Act, an individual must show that (1) he has a disability; (2) he is otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as a result of his disability. *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999); *Gordon v. E.L Hamm & Assoc.Inc.*, 100 F.3d 907, 910 (11th Cir. 1996); *Severino v. North Fort Myers, Fire Control Dist*, 935 F.2d 1179, 1183 (11th Cir. 1991).  "The Act defines 'individual with a disability' as any person who: (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record

of such impairment; or (iii) is regarded as having such an impairment.'" 29 U.S.C. §

705(20)(B); *Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir. 1999); *Mullins v.

Crowell*, 228 F.3d 1305 (11th Cir. 2000).  Blevins must show three elements to

establish that he suffers from a disability under the Act.  First, Blevins must show that

he is **impaired**.  Second, Blevins must identify a life activity that he claims has been

limited and show that it is a **major life activity** under the Act.  Finally, he must show

that the major life activity is **substantially limited** by the impairment.  *Rossbach v.

City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004).

Blevins contends that he is disabled under the Act by virtue of his employer

regarding him as disabled.  To establish that an employer regarded an employee as

"disabled" and therefore covered by the Act, a plaintiff must first introduce

***substantial*** evidence that the employer regarded him as having a permanent or long-

term impairment.  *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999)(emphasis

added).  "As with actual disabilities, a perceived impairment must be believed to

substantially limit a major life activity of the individual."  *Hilburn v. Murata Elecs.

N. Am., Inc.*, 181 F.3d 1220, 1230 (11th Cir. 1999)).

In his brief in Opposition to Summary Judgment, Blevins had the opportunity

to counter any and all arguments set forth in the Defendants' Motion for Summary

Judgment.  Instead, Blevins limited himself to the following assertions in his attempt

to establish that he is disabled and that he has been discriminated against based upon

his disability:

> (1) "the direct discrimination in this case is provided by the employer's facially discriminatory policy of refusing MST training to persons with medical impairments"; (2) "Plaintiff has demonstrated that he has a permanent or long term impairment.  Unlike the Plaintiff in Sutton, it is undisputed that Mr. Blevins's impairment is not temporary"; and (3) "[t]here is no question that the Defendants regarded Plaintiff's impairment as substantially limiting in his major life activity of working, in that they considered him disqualified from a class of jobs or a broad range of jobs (those encompassed by the multi-skill disciplines).  There is also no question that they were mistaken, since Plaintiff had been performing those jobs prior to being ejected from the MST program. That mistaken conception completes the elements of regarded as having a disability."

(Plaintiff's Brief in Opposition of Summary Judgment, p.29).

The foregoing assertions are mere conclusory statements.  In order for Blevins

to succeed in satisfying this element, he must introduce ***substantial*** evidence that the

employer regarded him as having a permanent or long-term impairment

Furthermore, as with actual disabilities, a perceived impairment by TVA, such as

what Blevins asserts exists in this case,  must be believed to substantially limit a

major life activity.  Blevins mere assertions lack actual analysis and evidentiary

support necessary under the Act.  In other words, Blevins has failed to illustrate

through an analysis of evidence that he was "regarded as having a physical or mental

impairment" by TVA; thereby failing to satisfy the first element of the prima facie

case of disability discrimination.  Furthermore, Blevins failed to provide evidence and
analysis in connection with the remaining elements required to establish a disability
(including "regarded as" disabled), including "substantially limits" and "major life
activity".  In order to prevail, Blevins must satisfy each requisite element.[12]

## B.   Major Life Activity/Substantially Limits

Although it is undisputed that Blevins has some limited physical constraints,
Defendants contend that Blevins failed to claim that those impairments ***substantially
limit him in any major life activity***.  Instead, Blevins merely attempts to fit himself
within the "regarded as" prong, the first of three  necessary requirements that all must
be satisfied to successfully establish a claim for disability discrimination. (Response
to MSJ, 28-29).  Blevins has failed to provide the Court with evidence suggesting that
anyone at TVA regarded him as having a physical or mental impairment which
***substantially limits*** one or more ***major life activities***.

The regulations define "major life activities" as "functions such as caring for
oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

---

[12]In his deposition, Blevins concedes that no one at TVA has ever asserted that he had or
has a "disability", nor have they referred to his medical constraints as a disability or disabling in
any way; instead, they refer to Blevins the same way he does himself, as having medical
constraints (Blevins dep. 132). Although not necessarily dispositive on its own, this testimony
bolsters Defendants' assertion that no one at TVA regards or regarded Blevins as being
"disabled."

learning, and working."  29 C.F.R. § 1630.2(i) (2005).  In *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999), the Supreme Court clearly established that not every physical impairment, disease, or condition will constitute a "disability" for purposes of the Americans with Disabilities Act (ADA) (and by extension, the Rehabilitation Act).  In doing so, the Court adopted the view that "[a] 'disability' exists **only** where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." (527 U.S. at 482).  The Court specifically rejected the idea that an individual should be considered as disabled simply because a person has a mental or physical impairment, where that impairment does not substantially affect the individual's major life activities.

According to the applicable Federal regulations, a person is "substantially limited" in the major life activity of working where he is "significantly restricted in the ability to perform either **a class of jobs or a broad range of jobs in various classes** as compared to the average person having comparable training, skills and abilities.  The inability to perform a single particular job does not constitute a substantial limitation in the major life activity of working."   29 C.F.R. § 1630.2(j)(3)(i) (2005); *Witter v. Delta Air Lines*, *Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998)(emphasis added).  Furthermore, "as with actual disabilities, a perceived

impairment must be believed to substantially limit a major life activity of the individual". *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1230 (11th Cir. 1999)).

Blevins's argument that TVA considered him to be "disqualified from a class of jobs or a broad range of jobs" is unsupported by the record. *Id.* It is undisputed that TVA considered Blevins physically able to work. (Brab. Supp. Decl. ¶5). The fact that TVA considered him unable to perform the majority of the essential functions of a Mechanical Maintenance Technician does not thereby render him "regarded as" being disabled by his employers. In *Sutton*, the Supreme Court held that an employer did not regard an employee as substantially limited where the employee was able to perform a single job.

Moreover, the Court finds it telling that Blevins admits he can do the work he has been assigned (Blevins dep. 148) and has never requested an accommodation in his workplace. (Blevins dep. 133, 146). Without supporting evidence, Blevins's conclusory statements asserting that Defendants perceived his medical restrictions as substantially interfering with his ability to work are insufficient to establish a claim of disability discrimination under the Act. Therefore, the Motion for Summary Judgment filed by Defendants is due to be **GRANTED** as to Blevins claim of disability discrimination due to Blevins' failure to establish that he is disabled

(including "regarded as" disabled) under the Act.

## II.    Retaliation

Blevins contends that his removal from the Multi-Skill Training on or about January 13, 2003, and his non-selection for the following positions were retaliation because he filed a union grievance and EEO complaints against individuals at TVA: (1) Maintenance Foreman on or about February 1, 2001, (2) Maintenance Foreman on or about August 15, 2002, and (3) Maintenance Coordinator on or about March 5, 2003.  Defendants contend that, based on the undisputed facts of record, Blevins cannot prove that he was the victim of retaliation.

A claim of retaliation under the ADA and ADEA is analyzed using the same framework as a retaliation claim under Title VII.  *Griffin v. GTE Florida*, 182 F.3d 1279, 1281 (11th Cir. 1999); *see Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).  To establish a prima facie case of retaliation under the ADA, a plaintiff must establish: (1) that he engaged in protected activity; (2) that his employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) there was a causal link between his protected activity and the adverse employment action.  *Americans with Disabilities Act of 1990*, § 2 et seq., 42 U.S.C.A. § 12101 et seq.  *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999)*(citing Little v. United Techs.*, 103 F.3d 956, 959 (11th Cir. 1997)).  The

establishment of a prima facie case of retaliation only creates a temporary presumption of discrimination; the burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for plaintiff's termination. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142-43 (2000); *St. Mary's Honor Ctr.*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 254.  After the defendant has articulated its legitimate non-discriminatory reason, the burden shifts back to the plaintiff.  Plaintiff must "prov[e] by a preponderance of the evidence" that defendants' legitimate nondiscriminatory reasons are pretextual.  *Burdine*, 450 U.S. at 253.[13]  Where the defendant articulates multiple, reasonable, legitimate, and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  *See Chapman,* 229 F.3d at 1024-25.  Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  *See Combs*, 106 F.3d at 1528.

## A.    Protected Activity

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or

---

[13] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  *Chapman*, 229 F.3d at 1030.

30

participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. 2000e-3(a).  It is undisputed that filing an EEO complaint is an example of a protected activity.[14]  Accordingly, it is undisputed that Blevins satisfied the first element of his claim by engaging in a protected activity when he filed EEO complaints.

Having successfully satisfied the first requirement of a prima facie case of retaliation[15], Blevins must now establish that his employer knew he filed the complaints, that he suffered an adverse employment action as a result of the filings, and that there was a causal link between his filing the complaints and the adverse employment actions.

### B.    Adverse Employment Action

Blevins asserts his removal from Multi-Skill Training,  the decisions not to select him as Maintenance Foreman, and the decision not to select him as

---

[14] In his first claim for retaliation resulting in his non-selection as Maintenance Foreman, Blevins argued that he was retaliated against for filing a union grievance wherein he complained that TVA had selected for a new position an individual who was not a member of the collective bargaining unit (Def. Tab 22; Blevins dep. 36-7).  "A complaint about treatment. . ., unrelated to statutorily-protected matters, does not constitute protected activity, and thus cannot serve as the basis for a retaliation claim."  *Freese v. Wuesthoff Health Systems, Inc.*, 2006 WL 1382111 at *4 (M.D. Fla., May 19, 2006).  Accordingly, Blevins has failed to establish a prima facie case of retaliation as to the first occurrence of his non-selection as a Maintenance Foreman.

[15] He has established the first element of the prima facie case of retaliation as to the second non-selection as Maintenance Foreman, the non-selection as Maintenance Coordinator, and the removal from MST.

Maintenance Coordinator were each adverse employment actions. An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Circuit 2000).   Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause," *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998), and "an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir. 2001).   Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, using both a subjective and an objective standard. *See Gupta*, 212 F.3d at 587; *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998).   It is undisputed that the asserted action amount to adverse employment actions.

### C.   Causal Connection and Knowledge of Protected Activity

Next, Blevins must establish that the decision maker had knowledge of Blevins' protected activity; and that there was a causal connection between his

protected activity and the adverse employment action. *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). It is well established in the Eleventh Circuit that the causal link requirement in an ADA retaliation claim is to be construed broadly. *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993) ("a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated"). To make this showing, a plaintiff must generally establish "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.* Although close temporal proximity between the employee's protected conduct and the adverse employment action may be sufficient to create a genuine issue of material fact of a causal connection, *id.*, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (internal quotations omitted). The causal link is not the sort of logical connection that would justify a prescription that the protected participation did indeed prompt the adverse employment action. If it were, the connection would rise to the level of direct evidence of discrimination. *Hairston v. G'ville Sun Publishing Co.*, 9 F.3d 913, 920 (11th Cir. 1993).

**Non-selection:  Maintenance Foreman  August 15, 2002**

On April 18, 2001, Blevins filed his first EEO complaint.[16]  On July 17, 2001, Lonnie Gray and James Guess, who were the subjects of the EEO complaint, gave sworn affidavits in connection with the EEO complaint.  On August 15, 2002, Blevins was denied the position of Maintenance Foreman.  Blevins asserts that he was denied the position of Maintenance Foreman on the second occasion in retaliation for filing the  EEO complaint for which Gray and Guess were the subjects.  It is undisputed that Gray and Guess were members of the panel who interviewed Blevins for the Maintenance Foreman position and that they had knowledge of the EEO complaint.  "Close temporal proximity between the protected conduct and the adverse-employment action can be sufficient circumstantial evidence of causation to allow the retaliation claim to proceed to the jury, unless there is undisputed proof that the employer had no knowledge of the protected activity at the time the decision was made."  *Brungart*, 231 F.3d at 799;  *Norman v. Southern Guar. Ins. Co.*, 191 F.Supp.2d 1321, 13332 (M.D.Ala. 2002).  The time between the making of the sworn statements by Guess and Gray in the first EEO complaint and the second non-selection was approximately one year.  Here, Blevins has not shown sufficient temporal proximity between his EEO complaint and his non-selection to establish

---

[16] The EEO complaint pertained to the first occasion upon which Blevins was not selected as Maintenance Foreman (February 1, 2001).

causation. *See id.*  The evidence shows a sixteen month lapse between the complaint and the non-selection; this period between the two events is not "very close" so as to establish the necessary temporal proximity.  *See Clark County*, 532 U.S. at 273, 121 S. Ct. at 1511 (relying on cases that held a three-month period and a four-month period insufficient in holding a 20-month period insufficient to suggest causality). The sixteen month period between Blevins' complaint and his non-selection as Maintenance Foreman falls outside the parameters for establishing causation.

## Removal from MST Training on January 13, 2003

On November 14, 2002, Blevins filed his second EEO complaint.[17]  Blevins asserts that, in retaliation for the November 2002 EEO filing, in January 2003 he was denied participation in MST.  (Def. Tab No. 36, Plaintiff's Sworn Statement, dated 2/5/03).  Brabham, who served as the Representative to Widow's Creek employees while they gave sworn affidavits in Blevins's second EEO complaint, also served on the WET team and was actively involved in the decision to remove Blevins from MST.  However, the sworn affidavits were given February 24, 2003, <u>after</u> Blevin's January 2003 removal from MST.  Thus, Blevins has failed to adduce any evidence that  Brabham had knowledge of Blevins' second EEO complaint prior to the time he and Dale McCarver help to facilitate Blevins's removal from MST.

---

[17] This EEO complaint pertained to the second time Blevins was not selected as Maintenance Foreman (August 15, 2002 non-selection).

**Non-Selection: Maintenance Coordinator, March 5, 2003**

On April 18, 2001, Blevins filed his first EEO complaint. On July 17, 2001,

Ricky Gott, one of the individuals who made the decision as to who would be hired

for the Maintenance Coordinator position, gave a sworn statement in Blevins's first

EEO complaint.[18] Ricky Gott, and Gladious Bynum were two of the three members

of the interview panel for the Maintenance Coordinator position. Although Blevins

asserts that Bynum was aware of the EEO complaint filed by Blevins because, during

all times relevant to this matter, she "was the only EEO Counselor at Widows Creek",

(Supp. Br. at 3), in fact, Ms. Bynum testified in her deposition that she is a

maintenance coordinator at Widows Creek and serves as a collateral duty EEO

counselor (Ct. Doc. 24, Att. 17; Bynum depo. at 6 - 7). Ms. Bynum also testified that

she was not knowledgeable of all EEO complaints coming out of Widows Creek since

employees sometimes filed them directly with TVA's Chattanooga office (Bynum

depo. at 8). Finally, Ms. Bynum testified that, although Plaintiff had made some

contacts with her, "he didn't pursue anything formal or any paperwork with me. . .I

didn't know anything about it" (Bynum depo. at 10). Blevins points to no evidence

to contradict Ms. Bynum's express disapproval of knowledge of the EEO complaint.

Blevins asserts that he was denied the position of Maintenance Coordinator in

---

[18] Ricky Gott was the subject of the first EEO complaint.

retaliation for filing the EEO complaint.

Defendants responded to Blevins's assertion by maintaining that the position was filled based upon the information gathered by the interview selection panel. They contend that the scores from the interview, which ultimately played a primary role in selecting someone other than Blevins, were based on the questions asked at the interview. Blevins disputes Defendants assertion that there is no evidence to indicate that the interview scores were based on anything other than the answers to the interview questions. For each of the ten questions posed to Blevins, Gott, Bynum, and Ferguson all gave Blevins the same rating. The record illustrates that both Bynum and Ferguson crossed out and changed some of their evaluation numbers, which resulted in their answers matching those of Gott. Gott was in charge of entering the scores into the computer. (Exhibit 9, Gott depo., 33:11-34:25; Exhibit 8, Interview Question Guide for Production Support Coordinators). Blevins contends that this evidence raises a question as to the propriety of the selection process and illustrates retaliatory conduct on the part of Gott. Gott, however, testified that he did not share his answers with the other panelists. Furthermore, although the Court finds Blevins's assertion interesting, Blevins has failed to assert a "causal connection" between Gott's alleged improper conduct and Blevins's protected activity. Blevins must establish **both** that the individual was aware of the protected activity **and** that

there was a causal connection between the activity and the adverse employment action. *Americans with Disabilities Act of 1990*, § 2 et seq., 42 U.S.C.A. § 12101 et seq. *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999)*(citing Little v. United Techs.*, 103 F.3d 956, 959 (11th Cir. 1997)).  The mere allegation that Gott was aware of the EEO complaint filed in April 2001 is not sufficient to establish a causal connection between that complaint and a non-selection which occurred in 2003.  In light of the two year lapse in time between Blevins's EEO complaint, for which Gott was the subject and Blevins' non-selection as Maintenance Coordinator, Blevins has failed to establish a causal connection.

After careful consideration, the Court concludes that Blevins has failed to establish a *prima facie* case of retaliation in connection with all alleged adverse actions.   Therefore, Defendants Motion for Summary Judgment is due to be **GRANTED** as to Blevins's retaliation claims.

### III.   Failure to Exhaust

Defendants contend that Blevins's failure to provide specific evidence of testimony by  Gladious Bynum and Ricky Gott during his EEO investigation amounted to a failure to exhaust as to his claim of retaliation. Three of Plaintiff's administrative EEO complaints alleged retaliation based on prior EEO activity[19].

---

[19]Blevins also alleges retaliation for his having filed a union grievance.  However, Blevins does not even allege, much less produce evidence showing, that the union grievance stated that

During the investigation of his EEO complaints, Blevins explained that he had "heard people actually speak" negatively of the EEO process; however, Blevins was unable to name the individuals or the witness to the comments.  (Blevins Jan. 5, 2003, aff. at 12-13; Blevins dep. at 71-73).  The  Fifth Circuit explained, Plaintiff "may not secure judicial review of these claims without prior administrative consideration."  *Ray v. Freeman*, 626 F.2d 439, 442 (5th Cir. 1980), cert. denied, 450 U.S. 997 (1981).  However, according to the Eleventh Circuit, " to cooperate with the agency and EEOC and to provide all relevant, **available** information is all that exhaustion requires."  *Wade v. Secretary of the Army*, 796 F.2d 1369, 1377 (11th Cir. 1986) (emphasis added).   In his deposition, Blevins stated that at that time of the administrative process he "probably" did not *have* the information from Eric Watkins regarding Gladious Bynum and Ricky Gott and therefore was unable to identify the individuals by name. (Def. Tab No. 22, Blevins depo., 71:22-72:4).  However, later in his deposition, Blevins unequivocally states that he did have that information prior to filing any of his EEO complaints.  (Def. Tab No. 22, Blevins depo., 78:7-79:15). Therefore, Defendants' Motion for Summary Judgment as to Blevins' retaliation claims on the basis of failure to exhaust is due to be **GRANTED**.

---

his complaint was that he was discriminated against because of his age or his alleged disability. Therefore, that union grievance is not protected activity.  *See Fleese v. Wuesthoff*, 2006 WL 1382111 at *4.

Accordingly, the Court finds that Blevins failed to cooperate during the administrative procedure and  made a good faith effort to comply with the requests made of him during the administrative process.   Therefore, Defendants' Motion for Summary Judgment on the basis of failure to exhaust is due to be **DENIED.**

### Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment is due to be **GRANTED,** as to all claims.

A separate **ORDER** will be entered contemporaneously herewith.

**DONE** this 17th day of August, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge